# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

CME, L.L.C.,                                  )
                                             )
                              Plaintiff,      )
                                             )
v.                                           )
                                             )    Case No. 6:23-cv-169-JAR
OASIS CAR WASH SYSTEMS, INC.,                )
                                             )
                              Defendant.      )

## <u>OPINION AND ORDER</u>

Before the court is the motion for summary judgment filed on behalf of defendant Oasis Car Wash Systems, Inc. ("Oasis") pursuant to Fed. R. Civ. P. 56(a). [Doc. 74].[1] Plaintiff CME, LLC ("CME") timely responded in opposition to the motion [Doc. 77; Doc. 78], and Oasis filed a timely reply brief [Doc. 84].

## I.    UNDISPUTED MATERIAL FACTS [2]

This action arises from a commercial contract dispute. Oasis is a Kansas corporation that manufactures and sells commercial car wash systems. Christine Lacy is the sole owner of CME, an Oklahoma limited liability company that owns and operates Bulldog Auto Spa in Sulphur, Oklahoma.

### A.    PRE-CONTRACTUAL NEGOTIATIONS

In January of 2019 and on behalf of CME, Ms. Lacy submitted an inquiry through Oasis' website concerning the purchase of automatic and self-serve carwash systems. [Doc. 78-1 at 1-2]. Oasis' Vice President, Curtis Wade, responded by sending

---

[1] For clarity and consistency herein, when the court cites to the record, it uses the pagination and document numbers assigned by CM/ECF.

[2] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

1

Ms. Lacy brochures containing specifications for Oasis' automatic carwash systems—*i.e.*, Oasis XP, BayWashi5, and Typhoon. [*Id*. at 1, 3-29]. Mr. Wade also provided Ms. Lacy with contact information for Ascentium Capital, a direct financing company that offers equipment leasing to businesses. [*Id*. at 1].

Nearly two years later on December 21, 2020, Ms. Lacy emailed Mr. Wade regarding her interest in purchasing a new BayWashi5 system. [Doc. 78-2 at 1]. Mr. Wade responded that same day and sent a sales quote for the i5 model. He also promoted a few technological add-on features and pointed Ms. Lacy toward informative videos and literature on products offered by Oasis. [*Id*.]. On February 15, 2021, Ms. Lacy inquired into the possibility of purchasing a refurbished BayWashi5 system and expressed interest in Oasis' self-serve carwash and vacuum systems. [Doc. 78-3 at 1]. Mr. Wade responded that, while there were no refurbished i5 models in Oasis' inventory, a used Typhoon system would become available for refurbishment within the next six weeks by way of a customer trade-in. [*Id*. at 1].

On or about February 17, 2021, Ascentium Capital approved CME's client application. [Doc. 78-20 at 4]. Mr. Wade sent Ms. Lacy and Ascentium Capital a final quote for a refurbished Typhoon system that same day. [*Id*. at 5-6]. Following a subsequent telephone conversation, Mr. Wade sent Ms. Lacy an additional sales quote for self-serve Jetstream carwash equipment and two self-serve vacuums. [Doc. 74-3; Doc. 74-4 at 2]. The following week, Ascentium Capital requested that Ms. Lacy provide all final quotes for the carwash equipment, electrical work, and plumbing so that CME's financing package could be finalized. [Doc. 78-8 at 4].

2

On February 23, 2021, Oasis sent Jerry Cleair to perform a site inspection at Bulldog Auto Spa. [Doc. 77 at 5, ¶ 15; Doc. 84 at 1, n.1]. Mr. Cleair was tasked with, among other things, determining whether certain system components would fit within Bulldog Auto Spa's equipment room. [Doc. 78-6 at 4 (59:2-9)]. Following his inspection, Mr. Cleair recommended that CME increase its amperage and water supply at the site and purchase an extension kit. [Doc. 78-7 at 6 (90:13-21)].

On February 24, 2021, Ms. Lacy inquired into Mr. Wade's experience in owning and operating a Typhoon carwash system. [Doc. 74-4 at 2]. Mr. Wade responsively informed Ms. Lacy that his carwash was located in the town of Neosho, Missouri with an approximate population of 12,000 people, and that his Typhoon serviced approximately 400 cars per day. [*Id*. at 1]. In response to questions about the average profit for each car serviced by his Typhoon, Mr. Wade sent Ms. Lacy a point-of-service ("POS") report generated by his site's point of sale machine from the previous day. [*Id*. at 1, 3-4]. The following day, Mr. Wade informed Ms. Lacy that Oasis' production team estimated installation could begin in "mid-May" on the condition that CME and Oasis reach a contractual agreement "in the next few days." [Doc. 78-13 at 1].

On March 1, 2021, Ascentium Capital followed up with Ms. Lacy about final quotes for the equipment, electrical work, and plumbing so that CME's financing package could be finalized. [Doc. 78-8 at 3]. Ms. Lacy sent a final quote to Ascentium Capital the following day and clarified that the quote was "for both the electrical to move it to 200 amps" and "the plumbing to do the extension lines," as "required by Oasis to install the automatic" Typhoon system. [*Id*. at 2].

### B.  FORMATION OF THE CARWASH CONTRACTS

On or about March 18, 2021, CME and Oasis entered into two contractual agreements. The first contract was for the purchase and installation of a refurbished Typhoon automatic carwash system in exchange for $127,035 ("Automatic Carwash Contract"). *See* [Doc. 74-1]. The second contract was for the purchase and installation of a new Jetstream self-serve carwash system in exchange for $122,910 ("Self-Serve Carwash Contract"). *See* [Doc. 74-3]. The carwash contracts contain a one-year warranty covering the repair or replacement of defective or malfunctioning system parts, and a provision that "[d]elivery dates shall be interpreted as estimated and in no event shall dates be construed as falling within the meaning of 'time is of the essence.'" [Doc. 74-1 at 3-4, §§ 3, 7; Doc. 74-3 at 4-4, §§ 3, 7].

### C.  PERFORMANCE UNDER THE CARWASH CONTRACTS

#### 1.  Refurbishment

The date on which Oasis began refurbishing CME's used Typhoon system is in dispute. CME contends the refurbishment began on May 12, 2025. [Doc. 77 at 7, ¶ 33 (*citing* Doc. 78-14)]. Oasis contends that "[t]he exhibit referenced by CME are only job sheets that identify certain *parts* (not labor) used by Oasis in refurbishing the Typhoon and labor was performed prior to May 12, 2021." [Doc. 84 at 5, ¶ 35].

#### 2.  Installation

On April 8, 2021, Oasis technician Darrell Ryan informed Ms. Lacy that his company was "looking at the week of June 7th for the shipping/installation." [Doc. 74-7 at 2]. In her responsive email, Ms. Lacy noted she "was told that [CME] would be

4

on the schedule for a Mid May [sic] install for the automatic" Typhoon system. [*Id*. at 1]. Oasis began installing equipment at Bulldog Auto Spa on July 12, 2021 and completed installation the first week of August. [Doc. 77 at 7, ¶ 34; Doc. 84 at 1 & n.1]. Jessee Trucking invoiced Oasis for transporting equipment to Bulldog Auto Spa, totaling $1,500. [Doc. 78-18].

### 3. Outstanding Balance Owed by CME

On July 26, 2021, Oasis employee Debbie Martens sent Ms. Lacy invoices "for the car wash units shipped to Sulphur" with a balance due of $4,738.21. [Doc. 78-19 at 5]. In response to Ms. Lacy's representation that Ascentium Capital had already paid the invoices, Ms. Martens surmised that the outstanding balance arose from (i) Mr. Clear's determination on February 23, 2021 that extension kits were needed "due to the placement of the equipment room" at Bulldog Auto Spa; (ii) standard freight charges; and (iii) sales tax from shipment. [*Id*. at 4]. Ms. Lacy responsively stated that Mr. Clear never communicated the need for extension kits and CME already paid its "own guys" $7,500 to do complete said extensions. [*Id*. at 3-4].

The following day, Ms. Martens emailed Ms. Lacy a line-by-line breakdown of the balance owed. Ms. Lacy responded by disputing the breakdown. [*Id*. at 2-3]. After discussing the issue with Mr. Wade and Mr. Clear, Ms. Martens provided Ms. Lacy with a revised line-by-line breakdown of the balance owed on August 10, 2021—now reduced to $4,138.21. [*Id*. at 1-2]. There is no indication in the record that Ms. Lacy responded to Ms. Martens' August 10 email. Ms. Martens followed up on September

28 regarding the balance owed but, according to the record, received no response from Ms. Lacy. [*Id*. at 1].

### 4.    Post-Installation Support

On August 14, 2021, Ms. Lacy informed Mr. Cleair that CME had to shut down the Typhoon system because it was "not cleaning the cars enough." She asked Mr. Cleair whether the issues with CME's Typhoon were due to the "high PH soap" recommended by Oasis or whether "the settings on the carwash needed to be readjusted." [Doc. 78-17 1-2]. Two days later, Mr. Cleair responded as follows:

> There are a number of factors that can be at play here. Did your chemical supplier set the presoak concentration for the proper strength? Are the high-pressure nozzles still spraying a full pattern and at what pressure[?] We are set up to be able to do high and low presoak, but should be able to see results with just high. If you want to give the chemical supplier my information so he can contact me[,] we may be able to resolve this easily. I will look at the wash packages and see if I can resolve anything from there.

[*Id*. at 1]. The record suggests that Ms. Lacy did not provide Mr. Cleair with the information requested. She instead added Bulldog Auto Spa's site manager, Rich Hood, to the email chain. [*Id*.].

Between August 9, 2021 and March 31, 2022, Oasis participated in approximately fifty calls with CME representatives for a total of seven hours and twenty-three minutes. [Doc. 74-2, ¶ 14; Doc. 74-6 at 2-7]. Oasis contends it provided CME support during these phone calls to troubleshoot and correct any issues raised. [Doc. 84 at 7, ¶ 46 (*citing* Doc. 84-6)]. In contrast, CME appears to contend that Oasis never provided any post-installation support. [Doc. 77 at 8, ¶ 42 (*citing* Doc. 78-15 at 7 (74:6-16)]. It is undisputed, however, that Oasis placed a credit hold on CME and

instructed Oasis employees not to supply replacement parts in response to CME's refusal to pay the $4,1038.21 balance on its account with Oasis.

## II.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate only where the pleadings, depositions, answers to interrogatories, and admission on filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Inferences supported by conjecture or speculation will not defeat a motion for summary judgment." Self v. Crum, 439 F.3d 1227, 1236 (10th Cir. 2006). However, "at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. At this stage, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light

most favorable to the non-moving party." <u>Schaffer v. Salt Lake City Corp.</u>, 814 F.3d 1151, 1155 (10th Cir. 2016) (citation omitted).

### III. SUMMARY JUDGMENT ANALYSIS

CME initiated this action on May 24, 2023, alleging as follows: (1) Oasis fraudulently induced CME into the carwash contracts by way of its agents' material misrepresentations; (2) Oasis breached the Automatic Carwash Contract by selling defective equipment and negligently installing the same; (3) Oasis violated its duty to exercise ordinary care in the performance of the Automatic Carwash Contract by selling CME defective and equipment and negligently installing the same; (4) Oasis violated its manifest duty to exercise ordinary care in the performance of the Automatic Carwash Contract by acting with reckless disregard to CME's property in its negligent performance under said contract; (5) Oasis breached its contractual warranty to CME by failing and/or refusing to repair or replace defective equipment identified by CME; and (6) because Oasis fraudulently induced CME to enter into the carwash contracts, CME is entitled to rescind the carwash contracts. As a result of its alleged injuries, CME seeks actual damages in excess of $75,000, exemplary or punitive damages in excess of $75,000, as well as attorney fees and costs.

In its motion for summary judgment, Oasis argues as follows: (1) any and all representations conveyed by Oasis' agents during negotiations were truthful; (2) CME has provided no evidence to support its negligence and breach of contract claims; (3) CME cannot prevail on its breach of warranty claim because, to date, the

company has not identified the purportedly defective part or parts of Oasis' carwash systems; and (4) CME's damages in this lawsuit are contractually limited.

## A. FRAUDULENT INDUCEMENT AND RECISSION CLAIMS

Generally, "for a false representation to be the basis of fraud, such representation must be relative to existing facts to those which previously existed, and not as to promises as to future acts." Citation Co. Realtors v. Lyon ("Lyon"), 1980 OK 68, ¶ 8, 610 P.2d 788, 790. An exception exists where "the promise to act in the future is accompanied by an intention not to perform and the promise is made with the intent to deceive the promisee into acting where he otherwise would not have done so." Id. Under Oklahoma law, a plaintiff must establish *all* of the following elements to succeed on a claim for fraudulent misrepresentation: (1) a material representation was made; (2) the representation was false and known to be false at the time it was made; (3) the representation was made with specific intent that the claimant rely upon it; and (4) the claimant relied upon the representation, resulting in injury. *See* Silk v. Phillips Petro. Co., 1988 OK 94, ¶ 13, 760 P.2d 174, 177; Oak Tree Partners, LLC v. Williams ("Oak Tree"), 2020 OK CIV APP 5, ¶ 87, 458 P.3d 626, 646. "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence." Bowman v. Presley, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1218.

### 1. Material Misrepresentations

According to CME, agents of Oasis induced it to purchase a refurbished Typhoon automatic carwash system—as opposed to a new BayWashi5 automatic carwash system—by falsely promising increased traffic and profitability for Bulldog

9

Auto Spa, by misrepresenting the installation date, and by making untrue statements regarding the scope of pre- and post-installation support for both carwash systems.

### i. *Promised Profits*

CME alleges that Oasis, through Mr. Wade, induced CME's purchase of a refurbished and defective Typhoon through misleading representations as to "the potential increase in profits" and "number of cars it could run through" in comparison to a BayWashi5 model. [Doc. 77 at 10]. These allegations are based on an email exchange between Mr. Wade and Ms. Lacy on February 24, 2021. *See* [Doc. 74-4]. As is clear from the face of their written communications, Ms. Lacy specifically requested information concerning the profitability of Mr. Wade's Typhoon system, and he responsively provided her with a POS report generated by his site's point of sale machine. CME does not allege that Mr. Wade's POS report was false and known to be false at the time sent; rather, CME appears to allege Mr. Wade used his POS data to mislead Ms. Lacy into believing she would experience identical daily profits and patronage if CME purchased the refurbished Typhoon rather than a new BayWashi5. This theory of liability fails for several reasons.

By alleging that, in order to maximize Oasis' profits, Mr. Wade deceived CME into purchasing a refurbished and purportedly defective Typhoon rather than a *new* BayWashi5, CME misconstrues the following undisputed facts: (i) Mr. Wade offered to refurbish a used Typhoon *in response to* Ms. Lacy's inquiry about purchasing a *refurbished* BayWashi5; (ii) when Ms. Lacy made this inquiry on February 14, 2021, there were no used i5 models available—in inventory or via imminent customer

10

trade-in—for Oasis to refurbish and Mr. Wade informed Ms. Lacy of the same; (iii) at some point within the six weeks following Ms. Lacy's inquiry, a used Typhoon would become available for refurbishment by way of customer trade-in and Mr. Wade informed Ms. Lacy of the same; and (iv) the record contains no evidence showing Mr. Wade represented to Ms. Lacy that purchasing a refurbished Typhoon would be more profitable than purchasing a new BayWashi5. *See* [Doc. 78-3 at 1].

When Mr. Wade sent the POS report on February 24, 2021, he had already informed Ms. Lacy that his Typhoon was located in the town of Neosho, Missouri with a population of approximately 12,000;[3] Oasis had already provided CME with final quotes for the new Jetstream self-serve and refurbished Typhoon automatic carwash systems, *see* [Doc. 74-1 at 1; Doc. 74-2, ¶ 12; Doc. 74-3 at 1], and Ms. Lacy had already notified Mr. Wade that CME was moving forward with the purchase of both Oasis systems, *see* [Doc. 74-4 at 1 ("Also I will be moving forward with everything I am just waiting on the electrician quote so we can get this over to the bank.")]. In light of the foregoing, CME's theory that Mr. Wade used his POS report to trick Ms. Lacy into purchasing the refurbished Typhoon fails as a matter of law.

### ii.    *Promised Installation Date*

CME alleges that "[p]rior to finalizing the contract[s], Oasis promised an installation day of May 2021." [Doc. 77 at 11 (*citing* Doc. 74-7 at 2)]. CME bases this allegation on an email that Darrell Ryan sent Ms. Lacy on April 8, 2021, wherein Mr. Ryan stated, "[W]e are looking at the week of June 7th for the shipping/installation."

---

[3] The approximate population of Sulphur, Oklahoma is 5,000, comparatively.

[Doc. 74-7 at 2].[4] Oasis is correct that the problems with this theory of liability are two-fold. As is clear from the face of his email, Mr. Ryan did not promise Ms. Lacy that Oasis would complete installation by June 7, 2021. Even if Mr. Ryan had made such a promise, the email in question was sent *after* CME contracted with Oasis for the carwash systems. Mr. Ryan's "representation" on April 8, 2021 could not have been a basis to induce CME into entering the carwash contracts on March 18, 2021. CME's theory that Mr. Ryan knowingly misrepresented the installation date for the intended purpose of (retroactively) inducing CME to contract with Oasis fails as both a matter of law and logic.

### iii.    Promised Support

CME offers several pieces of evidence in support of its theory that Oasis induced it to enter the carwash contracts by making false representations and material omissions as to pre- and post-installation support. *See* <u>Sutton v. David Stanley Chevrolet, Inc.</u>, 2020 OK 87, ¶ 10, 475 P.3d 847, 852-53 (Fraud can arise from "the intentional misrepresentation or concealment of a material fact which substantially affects another person.") (citation omitted).

First, CME points to Ms. Lacy's testimony that multiple Oasis agents promised CME clear communication and equipment support via pre- and post-installation inspections. *See* [Doc. 78-4 at 6-7 (84:25-85:1)]. Oasis does not dispute this contention. Second, CME claims Mr. Wade testified that—following Mr. Cleair's pre-installation

---

[4] While not cited by CME in support of its "promised installation date" theory, the court notes that Mr. Wade sent an email to Ms. Lacy on February 25, 2021 conditioning an estimated mid-May install date on the parties entering an agreement within "the next few days." [Doc. 78-13 at 1]. CME did not enter into the carwash contracts with Oasis until March 18—*i.e.*, twenty-two days later.

inspection—Oasis failed to inform CME certain system parts would not fit in Bulldog Auto Spa's equipment room. *See* [Doc. 78-7 at 6 (90:13-21)]. Oasis denies this allegation, asserts that CME has yet to identify any of the purported compatibility issues, and posits that any such issues are immaterial to its summary judgment motion. Third, CME relies on its expert report to support an allegation that Oasis failed to communicate the need for CME to purchase additional equipment— including a properly sized spot-free water pump and a freeze prevention system—to support the refurbished Typhoon system. *See* [Doc. 78-12]. According to Oasis, however, CME explicitly chose not to purchase such equipment and instead chose to use Bulldog Auto Spa's existing pump and winterization system. [Doc. 84 at 4, ¶¶ 29, 30; Doc. 84-4 at 2-4 (30:17-32:10)]. Fourth, CME asserts (and Oasis does not dispute) that, before expiration of the one-year warranty, Oasis instructed its employees to stop providing CME replacement parts. Finally, CME points to an August 14, 2021 email exchange between Mr. Cleair and Ms. Lacy to support its claim that *every* verbal and written request for post-installation support was met by Oasis technicians blaming the equipment and/or system failures on "chemicals" without providing further guidance. *See* [Doc. 78-17].

Oasis categorically disputes the latter contention. The record shows that beginning on August 9, 2021—days after Oasis completed installation at Bulldog Auto Spa—and continuing until CME's last phone call on March 31, 2022, Oasis participated in fifty phone calls with CME representatives for an approximate total of seven hours and twenty-three minutes. According to Oasis, its employees

sufficiently provided CME with support to troubleshoot and correct any issues raised during these calls. Oasis further contends that CME gave no notice of its purported dissatisfaction with the carwash systems until its lawyers sent Oasis a demand letter in September of 2022. [Doc. 74-2 at ¶ 14]. The record also indicates that, after being added to the August 14 email exchange with Ms. Lacy and Mr. Cleair, Mr. Hood neither responded nor requested any replacements or repairs from Oasis *in writing*— as required under the parties' carwash contracts.[5]

Notwithstanding, as the court views the evidentiary materials submitted in conjunction with the motion for summary judgment in favor of the nonmoving party, it appears that genuine issues of material fact exist as to whether Oasis made knowingly false representations to CME regarding pre- and post-installation support.

### 2.   Intent to Deceive

Fraudulent intent may be inferred from the circumstances surrounding the alleged act of fraud. *See* <u>Derakhshan v. Tizzio</u>, 2012 OK CIV APP 8, ¶ 9, 270 P.3d 215, 217 (*quoting* <u>Silk</u>, ¶ 13, 760 P.2d at 177). CME proposes that a jury question of fraudulent intent *must result* on its theory of pre- and post-installation support because "it can be inferred that [Oasis] never intended to provide the promised support, as it never provided the promised support." [Doc. 77 at 12 ("Questions of intent preclude summary judgment because it involves the trier of fact weighing intangible factors, such as the witness['s] credibility.") (*citing* <u>Buell Cabinet Co., Inc.</u>

---

[5] "[OASIS] warrants to the . . . [Purchaser] that OASIS' products will be free from defects in materials and/or workmanship under normal use and service for a period of one (1) year from date of shipment . . . The Purchaser shall be obligated to promptly report any failure to conform to this warranty in writing to OASIS within said period. . ." [Doc. 74-1 at 3; Doc. 74-3 at 4].

v. Sudduth, 608 F.2d 431, 433-34 (10th Cir. 1979)]. However, "[t]he mere fact that fraud is claimed will not justify the submission of that issue [to a jury] unless facts are produced from which an irresistible deduction of fraud reasonably arises." Oak Tree, ¶ 89, 458 P.3d at 646 (quoting Silk, ¶ 13, 760 P.2d at 177). The dichotomy presented by CME—that Oasis' intent to never provide the promised support can be inferred by CME's allegation that Oasis never provided the promised support—does not lead to an irresistible deduction of fraud. While evidence in a fraud case is usually circumstantial, "circumstantial evidence is not sufficient to establish a conclusion where . . . the circumstances give equal support to inconsistent conclusions or are equally consistent with contradictory hypotheses." Downs v. Longfellow Corp., 1960 OK 107, ¶ 25, 351 P.2d 999, 1005.

The record before this court gives equal, if not greater, support to a reasonable conclusion inconsistent with CME's theory that Oasis "never provided the promised support" and never intended to fulfill its promise to do so. [Doc. 77 at 12]. To start, the record shows that Oasis *did* provide CME pre- and post-installation support. Furthermore, it is undisputed that (i) an outstanding balance of $4,138.21 has existed on CME's account with Oasis since July 26, 2021; (ii) Oasis notified CME that it would not receive replacement parts until the outstanding balance was satisfied; and (iii) the balance on CME's account with Oasis remains outstanding to this day. Based on the foregoing, dismissal of CME's fraud claim is appropriate because "breach of contract alone is not proof of fraud."[6] Based on the foregoing, CME cannot establish

---

[6] Roberts v. Wells Fargo AG Credit Corp., 990 F.2d 1169, 1173 (10th Cir. 1993) ("[A]lthough plaintiffs allege fraud, they have presented no evidence that [defendant's] promise to perform was

that Oasis made false representations concerning pre- and post- installation support with intent to deceive CME into entering the carwash contracts. Oasis is therefore entitled to summary judgment on CME's claim for fraudulent inducement.

### 3. Rescission Pursuant to Fraudulent Inducement

In the same vein, CME contends it is entitled to rescind the carwash contracts because Oasis fraudulently induced it to enter into said contracts by making false statements. [Doc. 2, ¶¶ 44-47]. Under Oklahoma law, rescission requires the court to "put the parties back in the same position they were in prior to the making of the contract." Richardson v. Mustang Fuel Corp., 1989 OK 54, ¶ 11, 772 P.2d 1324, 1327; Okla. Stat. tit. 15, § 232 ("A contract is extinguished by its rescission."). Because CME's claim for fraudulent inducement fails as a matter of law, CME is not entitled to rescind the carwash contracts based on allegations of fraudulent inducement. Accordingly, Oasis is entitled to summary judgment on CME's rescission claim.

### B. BREACH OF CONTRACT AND NEGLIGENCE CLAIMS

As noted, CME alleges that Oasis breached the Automatic Carwash Contract by selling CME defective equipment and negligently installing the same. To establish a claim for breach of contract, a plaintiff must demonstrate "(1) formation of a contract, (2) breach of the contract, and (3) damages as result of that breach." Cates v. Integris Health, Inc., 2018 OK 9, ¶ 11, 412 P.3d 98, 103. "[A]ccompanying every contract is a common-law duty to perform [] with care, skill, reasonable experience

---

accompanied by an intent not to do so. Indeed, '[t]he only proof in this record upon which we can predicate an intent not to keep the promises made is the fact that such promises were not kept.'") (citation omitted); see also Lyon, ¶ 8, 610 P.2d at 790 (emphasizing the "wide distinction between the nonperformance of a promise and a promise made mala fide, only the latter being actionable fraud.").

and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract." Keel v. Titan Const. Corp., 1981 OK 148, ¶ 14, 639 P.2d 1228, 1232; *see also* Horton v. Hamilton, 2015 OK 6, ¶ 22, 345 P.3d 357, 365 & n.16 ("Gross negligence merely modifies the element of breach of duty and is statutorily defined as the 'want of slight care and diligence.'").

As the Court views the evidentiary materials submitted in conjunction with the motion for summary judgment in favor of the nonmoving party, it appears that genuine issues of material fact exist. Such issues include, but are not necessarily limited to: whether the refurbished Typhoon sold and installed by Oasis has ever functioned properly; whether Oasis negligently installed the Typhoon system; whether CME could have independently discerned the alleged lack of compatibility between its equipment room and the Typhoon system if Oasis had provided CME access to the Typhoon owner's manual; and whether Oasis properly tested the Typhoon system after completing installation. Summary judgment is inappropriate under these circumstances, and CME's claims for breach of contract, negligence and gross negligence shall be submitted to the trier of fact for trial.

## C.    BREACH OF WARRANTY CLAIM

To establish a claim for breach of warranty, CME must show "(1) the existence of the warranty; (2) that the warranty was broken; and (3) that the breach was the proximate cause of the loss sustained." Alexander v. Smith & Nephew, P.L.C., 98 F.Supp. 2d 1287, 1298 (N.D. Okla. 2000) (*citing* Am. Fertilizer Specialists, Inc. v.

Wood, 1981 OK 116, ¶¶ 6-9, 635 P.2d 592, 595). With respect to the first prong, the

carwash contracts contain a one-year warranty which provides, in pertinent part:

> The Purchaser shall be obligated to promptly report any failure to conform to this warranty in writing to OASIS within said period, whereupon OASIS shall, at its option, correct such nonconformity by suitable repair to such equipment, or furnish a replacement part F.O.B. shipping point, provided the Purchaser has stored, installed, maintained and operated such equipment in accordance with good industry practice, and has complied with specific recommendations of OASIS.

[Doc. 74-1 at 3, § 7; Doc. 74-3 at 4, § 7]. Turning to the second prong, Oasis contends

CME has never identified the purportedly defective carwash system part or parts

that require replacement or repair under the warranty. CME conversely alleges it

submitted numerous written warranty requests—via email and text message—and

called Oasis several times to report issues with the Typhoon system; however, Oasis

never provided any support contemplated under the warranty. CME further alleges

(and Oasis does not dispute) that, prior to expiration of the one-year warranty, Oasis

instructed its personnel to refuse CME's requests for replacement parts. Though

Oasis justifies its refusal to provide replacement parts by pointing to CME's refusal

to satisfy the $4,138.21 balance due on its account, Oasis cannot avoid the fact that

it began refusing to provide CME replacement parts before expiration of the one-year

warranty period. Moreover, genuine issues of material fact exist as to whether (i)

CME submitted any requests to Oasis for support contemplated under the warranty,

and (ii) if so, whether such request or requests were submitted in accordance with the

procedure set forth in § 7 of the carwash contracts. Consequently, Oasis is not entitled

to summary judgment on CME's claim for breach of warranty.

### D. LIMITATION OF LIABILITY CLAUSE

Oasis posits that, in the event this court does not grant summary judgment on all claims asserted in this action, CME's damages should be limited by law. [Doc. 74 at 14 ("In Oklahoma, parties (including consumers) are free to contractually limit their liability.") (*citing* Fretwell v. Protection Alarm Co., 1988 OK 84, ¶ 12, 764 P.2d 149, 153-53)]. Indeed, the carwash contracts contain a limitation of liability provision which provides, in pertinent part:

> THE REMEDIES OF THE PURCHASER SET FORTH HEREIN ARE EXCLUSIVE AND THE TOTAL LIABILITY OF OASIS WITH RESPECT TO THE CONTRACT OR THE EQUIPMENT AND SERVICES FURNISHED HEREUNDER, IN CONNECTION WITH THE PERFORMANCE OR BREACH THEREOF, OR FROM THE MANUFACTURE, SALE, DELIVERY, INSTALLATION, REPAIR OR TECHNICAL DIRECTION COVERED BY OR FURNISHED UNDER THIS CONTRACT, WHETHER BASED ON CONTRACT, WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHERWISE, SHALL NOT EXCEED THE PURCHASE PRICE OF THE UNIT OF EQUIPMENT UPON WHICH SUCH LIABILITY IS BASED.
>
> OASIS AND ITS SUPPLIERS SHALL IN NO EVENT BE LIABLE TO THE PURCHASER . . . FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS CONTRACT OR ANY BREACH THEREOF, OR ANY DEFECT IN, OR FAILURE OF, OR MALFUNCTION OF THE EQUIPMENT HEREUNDER, WHETHER BASED UPON LOSS OF USE, LOST PROFITS OR REVENUE, INTEREST, LOST GOODWILL, WORK STOPPAGE, IMPAIRMENT OF OTHER GOODS, LOSS BY REASON OF SHUTTING DOWN OR NON-OPERATION, INCREASED EXPENSES OF OPERATION, COST OF PURCHASE OF REPLACEMENT POWER, OR CLAIMS OF PURCHASER OR CUSTOMERS OF PURCHASER FOR SERVICE BASED ON CONTRACT, WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHERWISE.

[Doc. 74-1 at 4; Doc. 74-3 at 5].

It is well-settled that Oklahoma courts will enforce liability-limiting contractual provisions unless the provision is unconscionable or in violation of public policy. Fretwell, ¶ 10, 764 P.2d at 152. "In Oklahoma, a contract violates public policy only if it clearly tends to injury public health, morals or confidence in administration of law, or if it undermines the security of individual rights with respect to either personal liability or private property." Shepard v. Farmers Ins. Co., 1983 OK 103, ¶ 3, 678 P.2d 250, 251 (citation omitted); *see also* Schmidt v. United States, 1996 OK 29, ¶ 8, 912 P.2d 871, 874 (explaining that courts also consider "the equality of the parties' bargaining power, vis-à-vis each other . . ." in determining whether exculpatory contracts are enforceable). In assessing the parties' relative bargaining positions, Oklahoma courts consider: "(1) the importance of the subject matter to the physical or economic well-being of the party agreeing to the release and (2) the amount of free choice that party could have exercised when seeking alternate services." Schmidt, ¶ 8, 912 P.2d at 874 (citations omitted).

CME here asserts that the form contracts used by Oasis, in essence, present a take-it-or-leave-it deal which left CME with little choice in obtaining more favorable terms. In contrast, Oasis conclusively argues there was "no vast difference" in bargaining power because (i) CME was not seeking emergency services or time-sensitive equipment from Oasis, and (ii) CME was considering another equipment manufacturer when evaluating whether to purchase Oasis' equipment. [Doc. 84 at 10 ("[A]t the time the contract (containing the [liability-limiting] clause) was executed,

there must have been *no vast difference* in bargaining power between the parties[.]")
(*quoting* <u>Schmidt</u>, ¶ 8, 912 P.2d at 874) (emphasis in original)].

A defendant using a motion for summary judgment to test an affirmative
defense bears the burden to "demonstrate that no disputed material fact exists
regarding the affirmative defense asserted." <u>Hutchinson v. Pfeil</u>, 105 F.3d 562, 564
(10th Cir. 1997). Oasis provides no evidence in support of the factual allegations
purporting to establish its limitation-of-liability defense. The nature of the parties'
bargaining power is clearly material, and the summary judgment record does not
permit a determination of this issue as a matter of law. Though the court views with
some skepticism the notion that Ms. Lacy—the sole owner of CME, who holds over
thirty years of experience as a real estate investor and entrepreneur—found herself
in a bargaining position significantly inferior to Oasis, the court finds that contested
questions of fact preclude summary judgment on the issue of whether the liability-
limiting provision in the parties' carwash contracts is valid and enforceable.

## IV.  CONCLUSION

WHEREFORE, Oasis' motion for summary judgment [Doc. 74] is hereby
**GRANTED in part** and **DENIED in part**. Following entry of this Order, the status
of the claims asserted against Oasis are as follows:

1.    CME's first cause of action for fraudulent inducement is dismissed with
prejudice against Oasis.

2.    CME's second cause of action for breach of contract remains pending
against Oasis.

**3.**    CME's third cause of action for negligence remains pending against Oasis.

**4.**    CME's fourth cause of action for gross negligence remains pending against Oasis.

**5.**    CME's fifth cause of action for breach of warranty remains pending against Oasis.

**6.**    CME's sixth cause of action for rescission is dismissed with prejudice against Oasis.

IT IS SO ORDERED on this 1st day of April, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE